| | |
|---|---|
| BRITTNEY MCCULLERS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HOUSING AUTHORITY OF THE CITY )<br>OF RALEIGH )<br>)<br>Defendant. ) | **COMPLAINT** |

## INTRODUCTION

1. Plaintiff Brittney McCullers ("Ms. McCullers") brings these claims against the Raleigh Housing Authority ("RHA") for violating her rights under the federal Fair Housing Act of 1968, *as amended*, 42 U.S.C. § 3601 *et seq.*, and for RHA's continuing failure to comply with key provision of the Violence Against Women Act (VAWA), 34 U.S.C. § 12491, a practice which has a discriminatory effect on women living in RHA's public housing.

2. Ms. McCullers filed a complaint in Wake County District Court on December 28, 2016, against RHA alleging state claims for breach of contract, negligence, inter alia. Her complaint was transferred to Wake County Superior Court, and Ms. McCullers was later granted leave to amend to add her minor child, B.M.C. as a plaintiff. Their complaint is now pending in Wake County Superior Court. After the Court denied Plaintiffs' Motion to add two RHA employees in their individual capacities, Ms. McCullers filed a separate action on December 18, 2017 against these individuals and a motion to consolidate the two actions. RHA filed a motion to dismiss the December 18, 2016 action which was denied. RHA appealed the second action to the North

1

Carolina Court of Appeals and has filed a motion to stay the December 28, 2016 lawsuit until the appeal is decided. No federal claims have been made in either of these actions. Multiple depositions have been conducted in the December 28, 2016 lawsuit.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1367.

4. This Court has authority to enter declaratory judgments and to grant Ms. McCullers' request for injunctive relief under 28 U.S.C. §§ 2201 and 2202.

5. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) (1) and (2), because Defendant is a resident of the State of North Carolina and resides in the Eastern District of North Carolina, and because the events or omissions giving rise to Ms. McCullers' claims occurred in the Eastern District of North Carolina, specifically Wake County, North Carolina.

## PARTIES

6. Plaintiff, Brittney McCullers ("Ms. McCullers"), is a resident of Wake County, North Carolina. She is a tenant of public housing managed by Defendant Raleigh Housing Authority ("RHA"). At the time of the events relevant to this action, she had four children.

7. At all relevant times to this action, Ms. McCullers was a single mother. She is a victim of domestic violence at the hands of Robert Moore ("Mr. Moore"), her ex-boyfriend. Ms. McCullers and Mr. Moore have a child together, K.M.C... Ms. McCullers never cohabitated with Moore, and Mr. Moore was never an RHA tenant.

8. RHA is a public housing agency within the meaning of the United States Housing Act of 1937, 42 U.S.C. § 1437, *et. seq.* ("USHA").

2

9. RHA manages public housing units and a Section 8 Housing Choice Voucher Program in Wake County, North Carolina, pursuant to the provisions of USHA and the regulations promulgated in accordance therewith by the U.S. Department of Housing and Urban Development ("HUD").

10. At all times relevant to this action, Mike Ayodele ("Mr. Ayodele") was employed as a property manager by RHA for the public housing program.

11. At all times relevant to this action, Jackie Chavis ("Ms. Chavis") was employed by RHA as Assistant Director of Housing Management for the public housing program.

12. At all times relevant to this action, Tayloria Lewis ("Ms. Lewis") was employed by RHA as Director of Housing Management for the public housing program. In this position, Ms. Lewis oversees the public housing program administered by RHA.

## FACTS

13. From January, 2014, to March, 2017, Ms. McCullers was a resident at Eastwood Court, a public housing project operated by RHA. Her address was 543 E. Davie Street, Raleigh, NC.

14. Mr. Ayodele was the property manager for Eastwood Court at all times that Ms. McCullers was living at the property.

15. Ms. McCullers and her minor children occupied the rental unit at Eastwood Court under the terms of a written lease with RHA initially signed on December 10, 2013, and renewed on June 10, 2014, and this lease continued in effect.

16. Ms. McCullers' three minor children, B.M.C., M.M.C., and J.M.C. were listed as occupants on the lease.

3

### *Victim of Domestic Violence and Other Criminal Acts*

17. Throughout her tenancy at Eastwood Court, Ms. McCullers was repeatedly victimized by crimes committed on the premises, and beginning in 2015 and throughout the Spring and Summer of 2016, she repeatedly asked Mr. Ayodele for a transfer to another housing unit, the location of which would be kept confidential.

18. In April 2016, Mr. Moore, Ms. McCullers' ex-boyfriend, from whom she had separated in June 2015, broke into her apartment, entered Ms. McCullers bedroom and strangled her while their son, K.M.C., lay beside her. Ms. McCullers' child, B.M.C. entered the bedroom and saw Mr. Moore strangling her.

19. On or about July 28, 2016, Christopher Locus, a neighbor of Ms. McCullers, who Ms. McCullers suspected was regularly under the influence of illegal drugs, entered her rental unit without her consent, went upstairs to her bedroom, put a gun to the head of her current boyfriend, Mr. Davis, and threatened to kill Mr. Davis. Mr. Locus was arrested and charged with felony assault with a firearm. After his release on bail, Mr. Locus was shot and killed in an altercation unrelated to Ms. McCullers.

20. On or about August 8, 2016, Mr. Moore persuaded Ms. McCullers to allow him to visit for the day with their son, K.M.C. After Mr. Moore took K.M.C., he refused to return him for six weeks.

21. On August 22, 2016, with the assistance of Interact, a Wake County Domestic Violence Agency, and the victim's advocate from the Raleigh Police Department, Ms. McCullers filed a complaint for a domestic violence protective order in Wake County District Court and was granted an ex parte order domestic violence protective order. (File No: 16 CVD 600525).

22. Ms. McCullers' complaint stated that Mr. Moore, *inter alia*, beat her in the head and stomach after he discovered she was pregnant in June 2015, broke into her home and choked her in April 2016, made threats to burn down her home with her and her children inside, bit her, pointed a gun at her head and threatened to kill her on multiple occasions.

23. Wake County District Court has a policy of making a report to Wake County Department of Human Services, Child Protective Services Division ("CPS") when a complaint for a domestic violence protective order reveals that a minor child has been exposed to domestic violence. A report was duly made to CPS, and Ms. Carla White, a veteran social worker with CPS, was assigned to investigate.

24. During the course of her investigation, Ms. White spoke with Ms. McCullers and her three children and learned of the history of domestic violence and ongoing threats by Mr. Moore as well as the children's exposure to Moore's violence.

25. Just a little over a week after Ms. McCullers filed her complaint for a domestic violence order against Mr. Moore, on August 30, 2016, two men armed with guns approached B.M.C., Ms. McCullers' twelve year old daughter, as she was sitting on the back porch of the rental unit. They pointed guns in her face and asked about her the location of her mother and a female acquaintance of Ms. McCullers. B.M.C. ran inside and tried to warn her mother. The gunmen then tried to force open the front door of the rental unit. As Ms. McCullers was calling 911, the gunmen shot repeatedly into the rental unit.

26. At least five bullets penetrated the interior of the apartment, including the wall of Ms. McCullers' bedroom. A bullet penetrated her mattress.

27. The day after bullets were fired into Ms. Cullers' and her children's home, on August 31, 2016, Ms. White went to Wake County District Court with Ms. McCullers for a hearing on

5

her complaint for a domestic violence protective order. The court entered a domestic violence protective order for one year, finding that Mr. Moore "intentionally caused her bodily injury" and "placed her in fear of imminent serious bodily injury." A copy of this complaint and order was delivered to Mr. Ayodele's office by Ms. McCullers.

28. While in court with Ms. White, Ms. McCullers informed Ms. White that her rental unit was riddled with bullets the night before as a result of a shooting by two armed gunmen.

29. On September 1, 2016, Ms. White confirmed with the Raleigh Police Department Ms. McCullers' account of the shooting that had occurred the night of August 30, 2016.

## *Wake County Child Protective Services requests an emergency transfer for Ms. McCullers and her children*

30. On September 1, 2016, Ms. White called Mr. Ayodele and requested an emergency transfer on behalf of Ms. McCullers based on (1) the urgent domestic violence situation involving Mr. Moore, who still had K.M.C. in his custody and knew where Ms. McCullers and her children lived; and (2) the shooting that occurred on August 30, 2016 while Ms. McCullers and three of her minor children were inside the rental unit.

31. According to Ms. White's sworn testimony, Mr. Ayodele was rude, hostile, and uncooperative. He told Ms. White that neither the domestic violence protective order against Moore nor the shooting at her unit rendered Ms. McCullers eligible for an emergency transfer.

32. Ms. White then called the RHA main office and explained Ms. McCullers' need for an emergency transfer. The RHA employee who answered the call informed Ms. White that (1) Ms. McCullers was eligible for an emergency transfer based on both the domestic violence protective order and the shooting, and (2) that the employee herself would follow up with Mr. Ayodele because he was the person in charge of transfers.

6

33. Neither Ms. White nor Ms. McCullers ever heard back from Mr. Ayodele or from anyone at RHA.

### *Continuing Threats to the Family*

34. Following the August 30, 2016, shooting into Ms. McCullers' home, the two gunmen, later identified as Rashad Deon Myers and John Henry, were arrested and charged with felony discharge of a weapon into occupied property and felony assault with a deadly weapon with intent to kill.

35. The minor child B.M.C. identified both men during a line-up at the Raleigh Police Department. As a result, the Raleigh Police Department considered her a crucial witness.

36. Mr. Myers made bail shortly after his arrest. Ms. McCullers observed him near her apartment at Eastwood Court at least three or four times shortly thereafter.

37. Ms. McCullers' neighbors accused her daughter B.M.C. of lying, and Ms. McCullers received threats from Mr. Henry's girlfriend on Facebook.

38. B.M.C. was followed to school by two men in a car and called a "snitch" when she went to the neighborhood store.

39. For several months, Ms. McCullers and her children were too fearful to stay overnight in the rental unit at Eastwood Court, afraid that Mr. Moore would come to the rental unit and hurt them, and they were terrified that Mr. Myers and Mr. Henry, or people associated with them, would inflict further violence upon them. Ms. McCullers and her children spent most nights at the homes of relatives or friends, and returning to the rental unit only for short periods during the day.

40. As of the date of this filing, Mr. Henry has pled guilty to accessory after the fact to assault with a deadly weapon with intent to kill. Mr. Myers' charges are still pending.

*Legal Aid of NC requests an emergency transfer for Ms. McCullers and her children*

41. On October 26, 2016, Ms. McCullers' undersigned counsel, contacted counsel for RHA to request an emergency transfer for Ms. McCullers. Counsel for RHA advised that RHA required a tenant to complete a specific transfer request form. In 2016, the transfer request form was not available on RHA's website.

42. Ms. McCullers' counsel called Mr. Ayodele to obtain a copy of the specific transfer request form. Mr. Ayodele refused to provide it to Ms. McCullers' counsel and insisted that Ms. McCullers pick it up herself from his office. At that time, Mr. Ayodele's office was located several miles from Ms. McCullers' unit, and she did not have any means of transportation.

43. Ms. McCullers' counsel again contacted counsel for RHA, who provided the form to Ms. McCullers' counsel by e-mail.

44. On November 2, 2016, Ms. McCullers' counsel made a written request to Ms. Lewis, Director of Housing Management for RHA, for an emergency transfer on behalf of the McCullers family. The letter notified RHA of the shooting at Ms. McCullers' unit the night of August 30, 2016, Mr. Moore's history of violence, and the domestic violence protective order obtained by Ms. McCullers on August 31, 2016. It also notified RHA that B.M.C. was exhibiting serious symptoms of trauma.

45. Upon receipt of the written transfer request, Ms. Lewis asked Ms. Chavis, Mr. Ayodele's direct supervisor, to verify whether Ms. McCullers had previously requested an emergency transfer.

46. Upon information and belief, Mr. Ayodele told Ms. Chavis that Ms. McCullers had not made prior requests for an emergency transfer. Mr. Ayodele did not tell Ms. Chavis of Ms.

8

White's request on the September 1, 2016, on behalf of Ms. McCullers, and Ms. McCullers' own verbal requests made prior to September 1, 2016.

47. Upon information and belief, Ms. Chavis asked Mr. Ayodele to go to Ms. McCullers' unit and speak with her. Mr. Ayodele told Ms. Chavis that he went but no-one was there. Ms. Chavis took no further steps to address the emergency safety issues described in the November 2, 2016, request.

48. On November 29, 2016, RHA's counsel notified Ms. McCullers' undersigned counsel that the request for emergency transfer was denied because RHA was terminating Ms. McCullers' lease.

49. In early December 2016, Ms. McCullers received a notice of lease termination dated November 29, 2016, and signed by Mr. Ayodele, requiring that she vacate the premises by December, 12, 2016.

50. As explained in more detail below, this lease termination notice was not accompanied by a written "Notice of Occupancy Rights" as required by the Violence Against Women Act ("VAWA"), 34 U.S.C. § 12491. Further, RHA failed to provide a grievance hearing as required by the Lease and HUD regulations.

51. During this time, Mr. Moore continued to threaten Ms. McCullers, sending her a text message on December 27, 2016, in which he threatened to abduct K.M.C. again. Mr. Moore's knowledge of her location and familiarity with her rental unit caused Ms. McCullers to be very fearful he would return and inflict further violence upon her and her minor children.

52. On December 28, 2016, Ms. McCullers filed an affirmative Complaint and Motion for a Preliminary Injunction in Wake County District Court asking the court to require RHA to

9

transfer her and her minor children to a secure location. Ms. McCullers' Complaint raised various state law claims, including, *inter alia*, breach of contract and negligence.

53. On February 16, 2017, the court entered a preliminary injunction and ordered RHA to transfer Ms. McCullers and her children as soon as a suitable unit became available.

54. On or about March 10, 2017, RHA notified Ms. McCullers that a suitable unit had come available. Ms. McCullers and her minor children were permitted to move into the new rental unit shortly thereafter. Ms. McCullers and her minor children continue to reside in this unit.

55. As a result of RHA's failure to transfer them from Eastwood Court, both Ms. McCullers and her daughter B.M.C. experienced severe emotional distress and both were diagnosed with post- traumatic stress disorder in January 2017.

56. During this discovery conducted in the December 28, 2016 lawsuit, RHA admitted their failures to adhere to the requirements of VAWA and RHA's own policies, both as to Ms. McCullers, but also as to the other tenants of RHA who have endured and survived acts of domestic violence like Ms. McCullers.

57. Following the notice of lease termination dated November 29, 2016 and following the December 28, 2016 lawsuit that Ms. McCullers filed in Wake County District Court, RHA filed an action in summary ejectment in Wake County District Court seeking to evict Ms. McCullers and her minor children.

58. RHA filed this eviction action against Ms. McCullers and her family on December 29, 2016. As explained in more detail below, this eviction action was not accompanied by a written "Notice of Occupancy Rights" as required by the Violence Against Women Act ("VAWA"), 34 U.S.C. § 12491.

59. In June 2017, upon Ms. McCullers' motion to dismiss, the court dismissed RHA's summary ejectment action without prejudice.

60. On September 18, 2017, RHA issued a second notice of lease termination to Ms. McCullers based on the same grounds as the November 29, 2016 lease termination notice.

61. As explained in more detail below, this second lease termination notice also was not accompanied by a written "Notice of Occupancy Rights" as required by VAWA.

62. Ms. McCullers timely requested a grievance hearing and was represented by undersigned counsel throughout this administrative proceeding.

63. On March 27, 2018 and April 12, 2018, a hearing officer retained by RHA conducted the grievance hearing.

64. On June 22, 2018, the hearing officer issued a written decision reversing RHA's second notice of lease termination issued to Ms. McCullers.

## *VAWA 2013*

65. As a public housing agency, RHA must adhere to the applicable provisions of United States Housing Act ("USHA") and the regulations promulgated by the U.S. Department of Housing and Urban Development (HUD), see C.F.R. Parts 5, 960, 966 and 982.

66. On March 7, 2013, the Violence Against Women Act ("VAWA") was reauthorized and signed into law. 34 U.S.C. § 12491. The HUD regulations implementing VAWA 2013 ("V Final VAWA Rule") became effective on November 16, 2016. 81Fed. Reg. 80,724-80,825.

67. The Final VAWA Rule required that public housing authorities provide to all tenants threatened with lease termination or eviction a Notice of Occupancy Rights under VAWA, Form HUD-5380.

11

68. A Notice of Occupancy Rights under VAWA informs tenants of certain protections available to tenants of public housing, which include a prohibition against evicting a tenant from public housing as a direct result of criminal activity related to domestic violence, dating violence, sexual assault or stalking, where the tenant is or has been the victim.

69. On May 19, 2017, HUD's Office of Public and Indian Housing issued Notice PIH-2017-08 to Public Housing Authorities, including Defendant RHA.

70. Notice PIH-2017-08 further explained that VAWA 2013 and the Final VAWA Rule required PHAs to:

(1) Provide a Notice of Occupancy Rights under VAWA with all notices of lease termination or eviction notices to public housing tenants. 34 U.S.C. 12491(d); 24 C.F. R. 5.2005(a) (2);

(2) adopt an Emergency Transfer Plan, based on HUD's model Emergency Transfer Plan (form HUD-5381) no later than June 14, 2017;

(3) include in the public housing lease a description of the specific protections, including an emergency transfer, afforded to victims of domestic violence, dating violence, or stalking. 24 C.F.R. 5.2005(a) (4)

71. As of May 2018, RHA was not providing a Notice of Rights under VAWA with any notice of lease termination or eviction, even when RHA knew that the tenant was a victim of domestic violence as Ms. McCullers was;

72. As of May 2018, RHA did not have an Emergency Transfer Plan in place which afforded tenants all of the protections required by HUD's Emergency Transfer Plan.

73. On information and belief, RHA does not include a description of the protections afforded by VAWA 2013 into the lease it currently uses.

12

### *RHA's Domestic Violence Policy*

74. Approximately ninety percent (90%) of RHA's public housing households are headed by women.

75. According to the U.S. Department of Justice, approximately eighty five percent (85%) of victims of domestic violence are women.

76. On or about September, 2014, RHA developed its own domestic violence policy which included some of the protections for domestic violence victims afforded by VAWA 2013.

77. RHA's written policy for domestic violence victims was in effect at the time of the events relevant to this action. Pursuant to this policy, "victims of domestic violence will be assisted on a case by case basis, depending on the individual circumstances," and RHA may grant an emergency transfer for a domestic violence victim who "reasonably believes that he or she is under threat of imminent harm."

78. Ms. Lewis, as Director of RHA Public Housing, has admitted in sworn testimony that if RHA had known of the shooting and the domestic violence protective order, Ms. McCullers would have been granted an emergency transfer.

79. Ms. Lewis has further admitted in sworn testimony that the failure to give Ms. McCullers an emergency transfer under such circumstances would put RHA in violation of the lease and its own policies and responsibilities.

### *RHA's Failure to Supervise Property Managers/Delegation of Duty*

80. At all times relevant to this action, RHA delegated complete discretion to property managers in the areas of lease terminations, evictions, preliminary approval of transfer requests, and related VAWA compliance.

81. At all times relevant to this action, RHA delegated complete authority to property managers in these areas without appropriate safeguards. For example, if a property manager did not approve a transfer request, the request was denied without further review.

82. According to sworn testimony given by Ms. Chavis, Mr. Ayodele had sole discretion to issue notices of lease termination, handle grievance hearings, and pursue evictions against public housing tenants living in the projects he managed.

83. Ms. Chavis admitted that she never checked whether Mr. Ayodele had facts substantiating his notices of lease termination, did not have any standing meetings with him, and performed his annual evaluations without requesting input from any tenants at the multiple projects he managed.

84. At all times relevant to this action, property managers had the authority whether or not to approve a tenant's written request for a transfer.

85. Ms. Chavis admitted under oath that Mr. Ayodele did not approve Ms. McCullers' written request for emergency transfer made on November 2, 2016, and the request was denied as a result.

86. Mr. Ayodele managed multiple projects at RHA, some on an interim basis, others on a permanent basis. Between 2013 and December 2017 when he resigned, Mr. Ayodele was regularly involved in the training of new property managers.

14

87. Mr. Ayodele's office was responsible for sending tenants facing lease termination a copy of Notice of Occupancy Rights under VAWA.

88. Mr. Ayodele's office did not send Ms. McCullers a Notice of Occupancy Rights under VAWA with the notice of lease termination dated November 29, 2016 or September 18, 2017, or with the eviction action on December 29, 2016.

89. In May, 2018, Mr. Ayodele's secretary, Ms. Johnson, admitted under oath that it is not her practice to send a Notice of Occupancy Rights under VAWA to tenants facing lease termination or eviction. She has been employed by RHA and worked for Mr. Ayodele since July 2016.

## CLAIMS

### FIRST CLAIM

(Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601 et seq.)

90. Ms. McCullers re-alleges and incorporates by reference each paragraph previously alleged in this complaint.

91. As a woman and therefore on the basis of her sex, Ms. McCullers is a member of a class protected by the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

92. At all times relevant hereto, RHA was renting "dwellings" as defined by 42 U.S.C. § 3602(b), and RHA was subject to the Federal Fair Housing Act and Amendments (42 U.S.C. §§3601, *et seq.*)

93. RHA, through its employees and agents, injured Ms. McCullers by committing one or more of the following discriminatory housing practices in violation of the Fair Housing Act.

    a. Making unavailable or denying a dwelling to any person because of sex, in violation of 42 U.S.C. § 3604(a);

15

b. Discriminating against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of sex, in violation of 42 U.S.C. § 3604(b);

   c. Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected under the Fair Housing Act, in violation of 42 U.S.C. § 3617.

94. As a direct result of RHA's conduct, Ms. McCullers has suffered damages in that she was wrongfully deprived of an emergency transfer, and suffered emotional distress and other damages.

95. Ms. McCullers is an aggrieved person under the Fair Housing Act, 42 U.S.C. § 3602; therefore, she is entitled to monetary, declaratory and injunctive relief under the Federal Fair Housing Act, 42 U.S.C. § 3613.

## SECOND CLAIM

(Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)

96. Ms. McCullers re-alleges and incorporates by reference each paragraph previously alleged in this complaint.

97. RHA's practice of delegating to its property managers complete discretion over transfer requests, lease terminations, evictions, and related VAWA compliance and/or its failure to supervise these property managers has a disparate impact on women.

98. RHA's failure to comply with key provisions of VAWA 2013 and the Final VAWA Rule has a disparate impact on women, a protected class based on sex under the Federal Fair Housing Act.

99. As a direct result of RHA's failure to adequately supervise its property managers, Ms. McCullers was wrongfully deprived of an emergency transfer and notice of rights, and has suffered emotional distress and other damages.

100. Ms. McCullers is an aggrieved person under the Fair Housing Act, 42 U.S.C. § 3602; therefore, she is entitled to monetary, declaratory and injunctive relief under the Federal Fair Housing Act, 42 U.S.C. § 3613.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. McCullers prays for entry of a judgment against RHA that:

1. Awards compensatory damages in an amount to be determined that would fully compensate Ms. McCullers for the loss that has been caused by the conduct of RHA alleged herein;

2. Awards punitive damages in an amount to be determined that would punish RHA for their willful, wanton, and reckless conduct alleged herein and that would effectively deter RHA from engaging in similar conduct in the future;

3. Declares that RHA has violated the Fair Housing Act and VAWA 2013;

4. Enjoins all unlawful practices alleged in this complaint and imposes affirmative injunctive relief requiring RHA, their agent and employees, and any other person acting in concert or participating with them to take affirmative action to provide equal housing opportunities to all tenant and prospective tenants without regard to sex;

5. Awards Ms. McCullers her reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(e);

6. Awards all such other relief as the Court deems just.

## JURY DEMAND

Plaintiff demands trial by jury.

This the 4th day of September, 2018.

LEGAL AID OF NORTH CAROLINA, INC.
Counsel for Plaintiff

By: *Suzanne Chester* / CRH with permission
Suzanne Chester (State Bar # 21977)
224 South Dawson Street (27601)
Post Office Box 106
Raleigh, North Carolina 27602
(919) 747-8498 (telephone)
suzannec2@legalaidnc.org

DUKE CIVIL JUSTICE CLINIC,
Counsel for Plaintiff

By: *Charles R. Holton*
Charles R. Holton (State Bar #5670)
Civil Justice Clinic
Duke Law School
Box 90360, 210 Science Drive
Durham, NC 27708-0360
(919) 613-7131 (telephone)
holton@law.duke.edu (email)